OPINION
This is an appeal by defendant, George A. Heath, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of four counts of gross sexual imposition.
On February 10, 1998, defendant was indicted on four counts of gross sexual imposition, in violation of R.C. 2907.06. The indictment alleged that the victim under each count was Stephanie Amich, an individual less than thirteen years of age.
The matter was tried before a jury beginning on November 16, 1998. The first witness for the state was Stephanie Lynn Amich ("Stephanie"), age eleven. Stephanie resides with her mother, Jody Heath, at 870 Northwest Boulevard. The defendant is Stephanie's stepfather. Stephanie's natural father, Daniel Amich, and her mother were divorced when Stephanie was four years of age. Stephanie has a younger brother, age three.
At the time of trial, Stephanie's mother was married to the defendant; however, the parties were in the process of obtaining a divorce. Stephanie gave the following testimony regarding the incidents giving rise to the indictment. On January 1, 1998, Stephanie, her mother and the defendant were in the living room of their residence. Stephanie's mother was asleep on the floor and the defendant was sitting on a couch. Stephanie and the defendant were watching the Rose Bowl. Stephanie was lying near the couch and the defendant started to rub her feet. Stephanie plays soccer and the evidence indicates that defendant had in the past rubbed or massaged Stephanie's feet and lower legs. Stephanie testified that, on this occasion, "he started to rub my calves and then went — he started to rub my knees, and then he started to rub my thighs, and then he started — he stuck his thumb through a hole in my pants and then under my underwear and touched me." (Tr. Vol. I, 37-38.) Stephanie elaborated that he touched her on the vagina with "a real quick rub." (Tr. Vol. I, 40.)
Stephanie's initial reaction was that he touched her vagina by accident, "but I just moved away because I felt uncomfortable." (Tr. Vol. I, 40.) At the time of the incident Stephanie did not tell her mother because of her belief that it was an accident.
Stephanie testified regarding a second incident on January 3, 1998. On that date, Stephanie was lying on her stomach on the floor of the living room playing Nintendo 64, a gift she had recently received from the defendant. Stephanie was wearing blue soccer shorts and a yellow soccer shirt. Stephanie's mother was in the kitchen at the time working at a computer. The defendant was sitting on the living room floor behind Stephanie. The defendant started to rub Stephanie's feet, calves, thighs, and "then he touched me again." (Tr. Vol. I, 49.) The defendant "rubbed back and forth with his thumb real quick * * * on my vagina." (Tr. Vol. I, 50.) The defendant stopped his activity when Stephanie moved and sat up. Stephanie did not tell her mother at the time about the incident "because I was afraid he might do something." (Tr. 52.)
Stephanie related that a third incident occurred on January 5, 1998. Stephanie was lying on the floor watching a television show when the defendant "started rubbing my feet, then my calves, and then my thighs, and then he tried to touch me again, only not on the skin." (Tr. 57.) She further explained that the defendant touched her vagina area but this did not involve skin-to-skin contact. The defendant also touched her on the buttocks. The defendant stopped when Stephanie moved away. Stephanie's mother was in the kitchen at the time. Stephanie was wearing a nightgown and a pair of gray stretch pants.
Later that night, when her mother came upstairs, Stephanie called her mother into her room and told her what had happened. Stephanie decided to tell her mother because she realized "it was wrong." (Tr. Vol. I, 61.)
Stephanie's mother went downstairs and confronted the defendant. The defendant later came upstairs and told Stephanie "I'm sorry. I never meant to hurt you." (Tr. Vol. I, 62.)
Joan Heath, the mother of Stephanie, also testified on behalf of the state. At the time of trial, Heath was married to the defendant but she testified that they had separated in May of 1997 and that they were in the process of getting a divorce. Heath was previously married to Stephanie's father, Daniel Amich, from November 1985 until June 1991.
Prior to the allegations giving rise to the instant action, the defendant would spend time at Heath's residence even though the parties were separated. According to Heath, the defendant was hoping for a reconciliation of the marriage.
Heath testified that she invited the defendant to her residence on January 1, 1998, and that he stayed overnight. The next day, Stephanie and the defendant went shopping. Stephanie had previously expressed interest in obtaining a Nintendo 64 game but Heath told her it was too expensive. Heath was surprised when they brought the game home.
The defendant slept overnight on January 3 and 4 at Heath's residence. On Monday, January 5, the defendant came over to Heath's residence at approximately 5:30 p.m. Stephanie was watching television that evening in the living room. The defendant was also in the living room. Heath was in the kitchen using the computer. Stephanie went upstairs to bed around 9:00 or 10:00 p.m.
Later, when Heath went upstairs to Stephanie's bed, she was surprised that Stephanie was still awake. Stephanie appeared to be upset; she was on the verge of crying and her voice was shaking. Stephanie initially indicated that nothing was wrong. When Heath asked her again, she said, "Andy tried to touch me again." (Tr. 217.) Stephanie told her mother that the incident occurred that evening while they were watching television.
Heath then went downstairs and said to the defendant, "I can't believe we're having this conversation again." (Tr. 220.) The defendant "said he was sorry if Stephanie felt he had done something inappropriate, that he had rubbed her butt like that, and if that was a crime he was guilty." (Tr. 225.) The defendant indicated that he was going to call a cab.
Heath went upstairs and brought Stephanie into her room to console her. Stephanie then told Heath about two other incidents during that week. Stephanie told Heath that during the football game the defendant "put his fingers up in the hole in her stretch pants and pushing aside her underwear and touching her and that she moved away from him." (Tr. 228.)
The defendant later came upstairs that night and indicated he was sorry. He stated that he had not meant to do anything to hurt Heath or Stephanie.
The next day, Heath contacted the Grandview Police Department. Detective Harper interviewed Stephanie about the allegations. Heath and Stephanie also spoke with an individual from Franklin County Children's Services a few days later.
Prior to the alleged incidents during January, Heath had observed the defendant massage Stephanie's feet and calves. The defendant would also massage Heath's feet and legs. The defendant gave Heath a book, entitled "The New Guide to Massage," as a gift before Christmas 1997. The defendant once performed a massage on Heath's buttocks area, following instructions from the book.
The state's next witness was Carol Harper, a patrol officer with the Grandview Heights police department. Officer Harper was working as a detective in the police department at the time of the allegations in the instant case. Officer Harper conducted an investigation. The officer knew Stephanie previously because Harper was a DARE officer and had spoken at Stephanie's school.
Harper interviewed Stephanie and her mother on January 6, 1998, and she interviewed the defendant on January 12. The defendant appeared for the interview with Judith Wherry, an attorney who was representing the defendant in the divorce proceedings. Harper asked the defendant about the alleged incident on January 1. The defendant stated that Jody Heath had picked him up and taken him to her house to watch the football game; however, he stated that "Stephanie wasn't there. He did later on in the interview recall that he thought Stephanie was there, but she was upstairs. He didn't have any contact with her." (Tr. 309.)
The defendant told Harper that on January 2 he was at Jody Heath's house and Heath was asleep on the floor. Heath was snoring and "he and Stephanie were laughing about Jody's snoring and Stephanie started complaining that her feet and legs hurt." (Tr. 309-310.) The defendant began massaging her feet and "he went up to her calves and her knees and her thighs and then he said that he * * * rubbed her butt, and if that's a crime then I'm guilty." (Tr. 310.) The defendant also told Harper that, on January 3, Stephanie was playing Nintendo and she asked him to rub her feet. The defendant started rubbing her feet, calves and then her thighs. He denied ever touching Stephanie on her vagina.
The defendant described another incident on January 5 when Stephanie was on her stomach on the floor and again asked the defendant for a massage. The defendant related that he "didn't think anything about it." (Tr. 312.) He rubbed her feet, calves and thighs again. That evening, the defendant was told to leave the house. The defendant called a cab and went upstairs; Stephanie and her mother were crying and the defendant indicated that he was sorry and that he did not mean to scare or upset Stephanie.
Bryn Moser, an employee with Children's Services, was the final witness for the state. Moser conducted an investigation into the allegations in the instant case. Moser went to the Heath residence on January 9, 1998, and spoke with Stephanie's mother. Moser returned on January 14 to interview Stephanie.
Following his interview with Stephanie, Moser sent the defendant a letter requesting an interview with him. The defendant met with Moser on February 4, 1998, at the Children's Services office. The defendant acknowledged that on January 2, he rubbed Stephanie's feet, calves and thighs at her request. He stated that on January 3, he again rubbed Stephanie's legs at her request.
The defendant related to Moser a third incident in which Stephanie asked him to rub her legs. The defendant denied ever touching her vaginal area. When Moser asked the defendant if he had ever touched Stephanie on the buttocks he stated, "yes, I touched — I rub her butt. That may be inappropriate, but I know what Jody likes when I massage her." (Tr. 388.)
The jury returned verdicts finding defendant guilty of all four counts. On December 7, 1998, defendant filed a "motion for mistrial." The motion asserted that, following the jury verdicts, some members of the jury had questioned the trial judge about an alleged prior act committed by the defendant. By decision and entry filed January 7, 1999, the trial court overruled the motion for mistrial. The trial court sentenced defendant by judgment entry filed January 13, 1999.
On appeal, defendant sets forth the following three assignments of error for review:
ASSIGNMENT OF ERROR NO. 1:
 THE TRIAL COURT DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BY REFUSING TO DECLARE A MISTRIAL AFTER THE JURY WAS EXPOSED TO INADMISSIBLE CHARACTER EVIDENCE OF APPELLANT'S "OTHER ACTS"
ASSIGNMENT OF ERROR NO 2:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BY OVERRULING APPELLANT'S CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL, AS THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF GROSS SEXUAL IMPOSITION BEYOND A REASONABLE DOUBT
ASSIGNMENT OF ERROR NO. 3:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BY FINDING DEFENDANT GUILTY, AS THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE
Under the first assignment of error, defendant contends that the trial court erred in failing to grant a mistrial after Joan Heath, the mother of Stephanie, made repeated improper references to prior allegations of sexual misconduct on the part of the defendant. More specifically, defendant points to four instances in which, it is contended, Heath made references alluding to prior alleged conduct by defendant.
At the outset, we note that, at the time of Joan Heath's testimony, there was a discussion between the trial judge and the parties regarding whether "other acts" testimony might be admissible. Specifically, the prosecutor asserted that testimony of prior conduct by the defendant was relevant to show motive under Evid.R. 404. The trial court ruled that such evidence, including whether defendant had been previously under investigation for alleged sexual misconduct, was inadmissible.
The first reference cited by defendant occurred during the prosecutor's direct examination of Heath. At the time, the prosecutor was questioning Heath about the events that took place on January 5, after Stephanie first told her mother that the defendant had touched her inappropriately. As noted under the facts, Stephanie and her mother were upstairs when Stephanie related these events, and the defendant was downstairs. Heath testified at trial that she came downstairs and confronted the defendant about the allegations. The prosecutor then asked Heath "what did you say?" (Tr. 220.) Heath responded, "I can't believe we're having this conversation again." (Tr. 220.)
Defense counsel immediately objected. The trial court overruled the objection and counsel asked to approach the bench. At a sidebar, counsel stated that the basis for his objection was because, "by her saying I can't believe we're having this conversation again, she's now hinting at prior acts. I'm moving for mistrial at this point in time." (Tr. 221.) In response, the prosecutor again attempted to argue that the statement was "relevant to his motive, to his intent, to his knowledge, to his lack of mistake or accident" pursuant to Evid.R. 404. The trial judge ruled that he had misunderstood the context of her statement and that he was sustaining counsel's objection but overruling the motion for mistrial.
The trial judge then gave the following instruction:
 THE COURT: * * * The Court has reversed its ruling on the statement made by the witness that — where she said I can't believe we're having this conversation again. I misunderstood the context.
 It is an improper statement by the witness. There's no evidence of anything before, and I misunderstood.
 I thought they were talking about these four sequences, so her statement is improper. I'm going to ask you to disregard it.
 I'm going to sustain the objection. It's not appropriate testimony with respect to these, you know, these four incidents that are alleged in the indictment. So the jury is to disregard that last statement. It's stricken from the record. (Tr. 222-223.)
The next reference cited by defendant also occurred during the prosecutor's direct examination of Heath. The prosecutor asked Heath what actions she took regarding the information she received from her daughter. Heath indicated that she contacted the Grandview Police Department. The prosecutor asked whether she had called "someone specifically." (Tr. 233.) Heath responded, "[w]e requested Detective Harper." (Tr. 233.) When the prosecutor asked Heath why she requested Detective Harper, Heath stated that she had "previous contact" with that detective. Defense counsel objected and another sidebar took place between counsel and the trial judge.
Following the sidebar, a recess was taken in order for the parties to research the issue, noted above, of whether prior acts evidence was admissible. The court ruled that such evidence was inadmissible, noting to the prosecutor that the effect of such evidence would be to "inflame this jury to help you make an element" of the offense. (Tr. 239.) Following the trial court's ruling on the admissibility of this evidence, the prosecutor stated she had advised Joan Heath "that she could not discuss any sort of — any prior other sexual activity." (Tr. 240.) The prosecutor further stated, "[y]ou know, if she inadvertently — I advised her not to mention any of that. I will not intentionally ask for anything to elicit that response, and we'll have to see what happens." (Tr. 240.)
The next reference cited by defendant occurred during the redirect examination of Heath, in which the following exchange took place between the prosecutor and Heath:
 Q. Okay. When Stephanie first told you about what Andy did, why did you first call your divorce attorney?
A. I don't know if I'm allowed to say. Do I say and —
Q. No.
 A. I could say it was at the instruction of a previous situation that was similar and advice from an attorney. (Tr. 283.)
At that point in the proceedings, defense counsel again moved for a mistrial, and the trial judge stated the following:
 THE COURT: Okay. First of all, the objection is sustained and the jury shall disregard.
 Again, you know, this is the witness attempting to bring up improper evidence, and she's been warned about it and she keeps trying to do it, and so I'm going to warn the jury to disregard it.
 It's totally improper. Okay. And I'll overrule the motion for mistrial. (Tr. 283.)
The final reference cited by defendant occurred during the following exchange between the prosecutor and witness:
 Q. Jody, just for clarification, is it confusing to you as to what you are allowed to talk about in court and what —
A. Yeah. It makes it hard to tell the truth —
Q. You don't know all the evidence for trial —
[DEFENSE COUNSEL] * * *: Objection. Move for mistrial.
No, I have no idea. (Tr. 284-285.)
Following the objection, the trial judge stated, "[a]gain, * * * her comments are not * * * appropriate, and so I'm going to sustain it and ask you to disregard her comment about it makes it hard to tell the truth." (Tr. 285.) Defense counsel then stated that "we now have a pattern of improper conduct." (Tr. 285.) At that point, the trial judge indicated that the parties would conduct a sidebar conference. At the sidebar, although the trial judge indicated his belief that the comments by the witness were "intentional," the court overruled the motion for mistrial.
In general, the granting or denial of a motion for mistrial lies within the sound discretion of the trial court, and a mistrial is only necessary where "the ends of justice so require and a fair trial is no longer possible." State v. Garner (1995),74 Ohio St.3d 49, 59. The standard of review in determining whether an error occurring in a criminal trial is prejudicial is whether it affects the substantial rights of the accused; similarly, "a mistrial should not be ordered in a criminal case due to some error unless the substantial rights of the accused are adversely affected." State v. Smith (Jan. 27, 1995), Ashtabula App. No. 94-A-0032, unreported.
We will first consider defendant's contention that the statements by the victim's mother were inadmissible. At the outset we find no merit to defendant's contention that the statement by the victim's mother regarding a prior contact with a police officer constituted inadmissible evidence. Rather, we agree with the state that the statement was innocuous as the issue of prior contact was explained to the jury in the context that, prior to the incidents at issue in this trial, the officer had been Stephanie's DARE instructor at school.
More troublesome are the other three references cited by defendant. We note that defendant does not appear to contend that the prosecutor attempted, by misconduct, to elicit the statements from the victim's mother in which she alluded to prior sexual acts by the defendant.
Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." It has been noted that the danger in eliciting other-acts testimony at trial is that "the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crimes charged in the indictment." Statev. Cotton (1996), 113 Ohio App.3d 125, 131. Thus, "[i]t is a well-established rule of evidence that the prosecution in a criminal trial may not present evidence that a defendant has committed other crimes, wrongs or acts independent of the offense for which he is on trial in order to demonstrate that the defendant has a propensity for crime or that his character is in conformity with the other acts." State v. Davis (1989), 64 Ohio App.3d 334,339.
While evidence of other acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith, it may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). In this regard, we note that most of the above exceptions are not even arguably applicable to the facts of this case. The identity of the perpetrator was not in dispute, i.e.,
if the allegations were true, the defendant, and nobody else, committed the offenses. Neither was opportunity at issue; the evidence indicated that the defendant was regularly at the Heath residence and that he often stayed overnight despite the marital difficulties. Regarding the issue of intent, the Ohio Supreme Court has held that "[a] defendant's intent for allegedly doing the act which forms the factual basis for the criminal charge brought against him is a material element of the offense only if the statute defining the offense requires a particular intent."State v. Curry (1975), 43 Ohio St.2d 66, 71. This court has previously noted that "[i]ntent * * * is not an element of the crime of gross sexual imposition of a child under the age of thirteen in Ohio." State v. Laws (Dec. 22, 1998), Franklin App. No. 98AP-306, unreported (1998 Opinions 5926, 5933). Thus, the evidence offered was not admissible as to the issue of the defendant's intent.
Although the state does not strenuously assert that the testimony at issue was admissible under the evidentiary rules, the state suggests in its brief that the evidence regarding the prior incident "would arguably have been admissible to prove motive." We disagree. In Curry, supra, the court noted that "motive" has been defined as "`* * * a mental state which induces an act.'" Id.
at 70, citing Shelton v. State (1922), 106 Ohio St. 243, 248. Under the facts of Curry, the defendant was charged with statutory rape. The court noted that the motive in that case was apparent; "[a] person commits or attempts to commit statutory rape for the obvious motive of sexual gratification." Curry, supra, at 71. The court concluded "[s]ince motive can not be deemed to have been a material issue at appellant's trial, `other acts' testimony was not admissible to prove this matter." Id.
In State v. Smith (1992), 84 Ohio App.3d 647, 665 the court held that in a prosecution for gross sexual imposition, evidence of the defendant's other sexual acts was inadmissible to prove his motive or intent to commit the crimes charged. The court held that "the motive and intent of the alleged actor remain * * * those of sexual gratification. That fact is apparent from the charges and is not a material issue." Id.
In the present case, the primary determination for the jury was simply whether the alleged acts occurred. The only relevance of the mother's statements about a previous similar incident involving the defendant would have been as propensity evidence, i.e., that defendant had tendencies toward touching children. Thus, we find no merit to the state's contention that evidence of prior similar acts may have been admissible to prove motive. In sum, we conclude that evidence of other prior acts by the defendant was not admissible for any purpose.
We must still consider, however, whether the introduction of this improper evidence, in the form of the mother's testimony, materially prejudiced the case and affected a substantial right of the defendant, i.e., the right to a fair trial. Where inflammatory prior-acts testimony does not serve any of the permissible purposes, "the conviction must be reversed unless there is no reasonable possibility that this testimony contributed to the accused's conviction." Cotton, supra, at 133. Regarding the first objectionable remark by the witness, in which the witness stated that she could not believe she and the defendant were having this conversation "again," even assuming it to be an unexpected or volunteered comment, the record is clear that the witness was instructed after that statement to refrain from any other references of prior acts by the defendant. The witness thereafter made the statement regarding "a previous situation that was similar" to the instant allegations. The trial court noted at that point that the witness had "been warned about it and she keeps trying to do it." (Tr. 283.) The trial court viewed the subsequent comment by the witness about it being "hard to tell the truth" as "intentional" conduct by the witness.
We agree with the trial court's assessment that the statements at issue do not appear to be inadvertent, and the effect of the testimony was to place before the jury inflammatory evidence of a propensity on the part of the defendant to engage in improper sexual conduct. Further, we find that the testimony at issue was prejudicial to defendant's case. As noted by defendant, there were no other witnesses to the crime, and no physical or other circumstantial evidence was introduced by the state to corroborate the victim's testimony. Thus, in the absence of corroborating evidence, the only direct evidence linking defendant to the crimes charged came from the alleged victim, and the determination for the jury came down essentially to her credibility. However, the improper statements by the mother provided such corroborating evidence, allowing the jury to infer that, because defendant had previously engaged in improper sexual conduct, he must have committed the acts for which he was charged in the instant case. Such evidence was highly prejudicial and could have affected the outcome.
A number of Ohio cases have held that the impermissible introduction of other acts testimony in criminal sexual conduct cases may at times be so prejudicial as to necessitate the granting of a new trial. See, e.g., State v. Clemons (1994),94 Ohio App.3d 701, 711 (other act testimony elicited from alleged victim's mother regarding defendant's problem with masturbation was highly inflammatory and not harmless beyond a reasonable doubt; defendant's conviction depended entirely upon credibility of the alleged victim and victim's testimony may have been improperly bolstered by other acts evidence); Davis, supra, at 340 (other act testimony regarding defendant's drinking problem and temperament, and evidence depicting defendant as child abuser, constituted reversible error in defendant's prosecution for rape and sexual battery); State v. Hurst (July 27, 1992), Clermont App. No. CA91-08-064, unreported (other act testimony inferring that appellant had a history of being sexually active with teen-age females approximately the same age as the victim was "extremely inflammatory and could only cause the jury to engage in `unwarranted and possibly prejudicial speculation as to the appellant's guilt'"); Cotton, supra, at 134 (where there existed a real possibility that the victim's testimony may have been improperly bolstered by other acts testimony of past sexual allegations against defendant, prejudice to defendant required granting of a new trial); State v. Thompson (1981), 66 Ohio St.2d 496,499 (because of real possibility that highly inflammatory subsequent acts testimony contributed to accused's conviction, error in its admission cannot be considered harmless).
In the present case, the witness did not simply volunteer a fleeting, extraneous reference to a prior act; rather, the witness made multiple references alluding to improper activity by the defendant, including the statement that the other act was "similar" to the charged offense. The danger that the jury will convict because it assumes the defendant has a propensity to commit criminal acts "is particularly high when the other acts are very similar to the charged offense, or are of an inflammatory nature." State v. Schaim (1992), 65 Ohio St.3d 51, 59. Further, under the circumstances, the fact that the trial court gave a curative instruction after each statement fails to convince this court that the statements had no affect on the verdicts. See,e.g., State v. Wilkins (Sept. 29, 1999), Summit App. No. 19315, unreported (based on inflammatory nature of witness' testimony about prior offense, trial court's limiting instruction was inadequate to remedy the effect of the improperly admitted evidence on the jury). While it is not easy to ascertain the effect of such evidence on a jury, in the instant case the record reveals that, following the return of the verdicts, jurors questioned the trial judge about the alleged prior conduct by the defendant. Specifically, at the sentencing hearing on January 7, 1999, the trial court noted on the record that "we were all back in the jury room * * * afterwards, including myself, and there was no question that some of the jurors asked about this prior incident. They were curious about this prior incident of investigation * * *." (Tr. 11.) Upon review of the record, including the inflammatory nature of the statements, their cumulative effect on the proceedings, and the jurors' expressed interest in the alleged conduct, our confidence in the verdicts is undermined, and we are unable to conclude that there is no reasonable possibility the other act evidence did not bolster the victim's testimony and contribute to the jury's verdict. Clemons,supra; Cotton, supra, Thompson, supra. Accordingly, we find that the trial court erred in failing to grant a mistrial and this matter must be remanded for a new trial of the charges.
Defendant's first assignment of error is sustained.
Under the second assignment of error, defendant asserts that the trial court erred in overruling defendant's Crim.R. 29 motion for judgment of acquittal; defendant maintains that there was insufficient evidence to sustain a conviction. We disagree.
In order to determine whether evidence is sufficient to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The offense of gross sexual imposition "requires proof of sexual contact with a person who is not the offender's spouse when the other person is less than thirteen years of age." State v. Harrod
(Oct. 8, 1999), Hamilton App. No. C-990018, unreported. "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).
Defendant's main contention is that there was insufficient evidence that any touching by defendant was done for the purpose of sexual arousal. However, it has been held that "a defendant's motivation in touching a child's vagina can be inferred by a jury, particularly when that defendant apologizes to the child and says what he did was wrong after the child tells him to stop touching her." State v. Clashman (Feb. 26, 1999), Jefferson App. No. 97 JE 8, unreported. The issue is "would an ordinary prudent person or a reasonable person sitting as a juror perceive from the defendant's actions, and all of the surrounding facts and circumstances, that the defendant's purpose or specific intention was arousal or gratification of sexual desire." Statev. Horrigan (Feb. 19, 1999), Montgomery App. No. 17260, unreported.
In the present case, Stephanie testified that on three separate occasions the defendant touched her vagina area and that on one of those occasions he rubbed her buttocks. Based upon the facts presented, we find that a reasonable trier of fact could conclude that the touching by defendant was done for sexual gratification. Thus, we conclude that there was sufficient evidence presented, when viewed in a light most favorable to the state, upon which the jury could have found the essential elements of gross sexual imposition proven beyond a reasonable doubt. Defendant's second assignment of error is overruled.
Under the third assignment of error, defendant contends that his conviction was against the manifest weight of the evidence. The legal concepts of sufficiency of the evidence and weight of the evidence are different. State v. Thompkins (1997),78 Ohio St.3d 380, paragraph two of the syllabus. In considering defendant's sufficiency argument, we concluded above that there was evidence presented such that a rational jury could have found the defendant guilty of gross sexual imposition. Our disposition of the first assignment of error, requiring that this matter be remanded for a new trial, renders moot defendant's third assignment of error, "as even if he were successful in prevailing under this part of the assignment, we would be required to remand this matter to the trial court for a new trial." State v. Staton
(Dec. 22, 1997), Butler App. No. CA-97-08-0156, unreported, citingThompkins, supra.
Based upon the foregoing, defendant's first assignment of error is sustained, defendant's second assignment of error is overruled, the third assignment of error is rendered moot, the judgment of the trial court is reversed and this matter is remanded to the trial court for a new trial.
Judgment reversed; cause remanded.
PETREE, J., and LAZARUS, P.J., concur.